Morgan Lowell LOVVORN, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 76–1164C(3).

United States District Court, E. D. Missouri, E. D.

Nov. 14, 1977.

Dale L. Rollings, Bruere & Rollings, St. Charles, Mo., for plaintiff.

Wesley D. Wedemeyer, Asst. U. S. Atty., U. S. Dept. of Justice, St. Louis, Mo., for defendant.

## MEMORANDUM

NANGLE, District Judge.

Plaintiff Morgan Lovvorn brought this suit to recover damages for injuries sustained as a result of alleged negligence on the part of defendant.

This cause was tried to the Court without a jury. The Court having considered the pleadings, the testimony of the witnesses, the documents adduced in evidence and being otherwise fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure:

## FINDINGS OF FACT

1) Plaintiff Morgan Lovvorn was, at the time of the incident herein, a 40-year-old male, employed by the McDonnell Douglas Corporation as an analyst whose duties consisted of acquiring spare parts for F–15 and F–4 aircrafts. Plaintiff had worked for McDonnell Douglas Corporation for nine years. Prior to such employment, plaintiff was a member of the United States Air Force. He was not, however, a pilot and did not work around airplanes. His job was to obtain parts.

2) In 1975, plaintiff was sent by McDonnell Douglas Corporation to the USS Independence, an aircraft carrier, as a technical supplier representing McDonnell Douglas. While on the carrier, a decision was made to send plaintiff to Norfolk, in connection with supplies, and then return plaintiff to the carrier. Plaintiff was to be transported on an E–2B aircraft, owned by the United States Navy and operated by service members of the Navy and employees of the United States acting within the scope of their duties. Plaintiff had not seen this type of aircraft until the day before he actually flew in the same and was totally unfamiliar with the E–2B.

3) On the night before the flight, October 2, 1975, Lieutenant Commander Arthur J. Schroeder briefed plaintiff. Plaintiff was given the equipment which he would wear on the flight and Schroeder assisted plaintiff in donning the equipment. Schroeder took plaintiff onto the flight deck and showed him the aircraft. Plaintiff approached the plane, following Schroeder, by walking through the propeller arc. The general policy with reference to the E–2B prohibits walking through the propeller arc when the engines are not running to prevent the development of bad habits.

4) The configuration of the aircraft is such that the propellers are very close to the hatch door. The inside of the aircraft contains a few seats for passengers. The aisle is very narrow and the plane is crowded with equipment and electronic gear.

5) Once inside the plane, Schroeder discussed ditching and bailout procedures with plaintiff. Plaintiff was also shown how to connect the ICS communication system and oxygen. When plaintiff and Schroeder exited the plane, they again walked through the propeller arc. Schroeder did not point out to plaintiff any markings on the aircraft which warned of the danger of the propellers. Plaintiff did not notice these markings. Plaintiff was not instructed on the proper manner of boarding or exiting the aircraft.

6) On October 3, 1975, the day of the flight, plaintiff went to the ready room at approximately 8:00 a. m. Plaintiff met the crew for the first time. Lieutenant Commander Carl Curry was the pilot and Lieutenant Geoffrey Dundas was co-pilot. Schroeder was also making the trip as was Commander James Duffy. Duffy was not a member of the normal flight crew; he was to be a passenger. Because of Duffy's presence, the flight would make a stop in Oceana Virginia Naval Air Station before landing in Norfolk, to allow Duffy to depart. Plaintiff overheard parts of conversations between these individuals that morning but was not a part of the conversations. He heard references made to Oceana

but was not told that the plane would be landing in Oceana. The decision to stop at Oceana to allow Duffy to disembark was not even made until the aircraft took off. Although Curry had indicated to Duffy that morning that he was willing to stop in Oceana, Curry told Duffy that he would tell Duffy whether he could stop or not once the plane was airborne. Plaintiff heard no discussion at this time of the proper way to board or deboard the aircraft.

7) Plaintiff boarded the aircraft that morning by walking through the propeller arc. He was buckled into his seat and received assistance from Schroeder with his ICS communication system. The evidence indicated that plaintiff's ICS was not functioning properly although it is not clear that the crew, with the exception of Schroeder, was aware of the problem. The aircraft was launched by means of a catapult shot. Plaintiff was tense, lightheaded, nervous and excited as a result of the catapult shot and the flight in general. The aircraft landed in Oceana. Upon arrival at Oceana, Curry did not stop the propellers although the N.A.T.O.P.S. E–2B Manual required that crew members not exit the plane until the propellers were stopped.

8) The plane stopped about 50 yards from the operations building. Schroeder and Duffy left the plane. Plaintiff at this time was still dizzy from the flight. He sat by himself for a moment, unable to see the pilot or co-pilot from where he was sitting. Neither Curry nor Dundas talked to plaintiff or checked on him while the plane was stopped at Oceana; both knew, however, that he was alone in the aircraft.

9) Plaintiff decided to exit the plane. He walked down the steps out of the plane. The evidence indicated that because of the angle of the steps, a person descending would be looking downward. Thus, a warning concerning the propellers which was located across from the hatch would not be within the immediate range of vision. There were no markings on the ground to follow to safety. The most direct path from the plane to the operations building was through the propeller arc. Plaintiff was nervous, confused and excited. He was not at all certain of his location, and had been left alone in a complicated and unusual type aircraft. He looked for Schroeder and Duffy, and saw them approaching the operations building. He was viewing them through the propeller arc but because the propellers were running at approximately 1100 rpm, he could not see the propellers at all. Due to the design of the plane and location of the hatch door, the noise from the engines and propellers is audible but one cannot discern the direction from which it emanates. Plaintiff started towards Schroeder and Duffy and hit the propeller. His arm was severed at the shoulder as a result.

10) Plaintiff was hospitalized at Portsmouth Naval Hospital, Portsmouth, Virginia. Surgery was performed and he remained there for 11 or 12 days. He was then transferred to Deaconess Hospital in St. Louis, Missouri and remained for 5 or 6 days. He was rehospitalized six weeks later as more surgery was required to close the wound. Plaintiff still experiences pain, known as phantom limb syndrome, from the injury. Plaintiff incurred medical bills and charges for physicians, hospitals, medications and prosthetic devices in the amount of $5,324.40.

11) Plaintiff has been unable to use an artificial limb because of the pain that the limb causes to his shoulder and muscles. He experiences difficulty in performing certain tasks at work and has been forced to hire help for chores around the house. He needs help from his family in connection with some of his personal care. The injury has adversely affected his relationship with his wife and two minor children. At the time of the injury, plaintiff had a life expectancy of 31.27 additional years.

12) Plaintiff knew that an airplane propeller was dangerous. He also was aware that if one was unable to see a propeller, it meant that it was revolving. Plaintiff was not warned, however, of the closeness of the propeller arc to the hatch door on the E–2B, nor was he instructed on the proper manner of boarding and exiting the craft.

Plaintiff was not warned that the engines would be left running, and thus the propellers revolving, during the stop at Oceana. Plaintiff was not told to remain seated when the plane arrived at Oceana and thought he was supposed to depart.

13) The Court finds that plaintiff has suffered damages in the amount of $85,-000.00.

14) On April 19, 1976, plaintiff filed an administrative claim pursuant to 28 U.S.C. §§ 1346(b) and 2675. When the Navy failed within six months to make a final disposition of the claim, plaintiff instituted this proceeding.

## CONCLUSIONS OF LAW

This Court has jurisdiction over the subject matter and of the parties in accordance with 28 U.S.C. § 1346.

■ Defendant's liability herein is to be determined in accordance with the ordinary rules of negligence, *Walthew v. Davis*, 201 Va. 557, 111 S.E.2d 784 (1960); *Surface v. Johnson*, 215 Va. 777, 214 S.E.2d 152 (1975), and thus, defendant was required to

> give notice or warning to an invitee of an unsafe condition which is known to him and is unknown to the invitee; but notice or warning is not required where the dangerous condition is open and obvious to a person who is exercising reasonable care for his own safety.
>
> . . . . .
>
> To sustain a charge of negligence the unsafe condition relied on must be one of which the owner knew or should have known, and the invitee did not know and could not reasonably have discovered.

*Trimyer v. Norfolk Tallow Co.*, 192 Va. 776, 66 S.E.2d 441, 443–44 (Va.1951). See also, *Harmon v. United States*, 532 F.2d 669 (9th Cir. 1975); *Smith v. United States*, 383 F.Supp. 1076 (D.C.Wyo.1974).

■ The Court has found that plaintiff was not warned on the proper mode of ingress and egress, nor was he warned at Oceana that the propellers were revolving. It is the Court's conclusion that a duty to so warn existed and that defendant breached this duty in failing to do so. The Court also concludes that plaintiff was not guilty of contributory negligence in failing to observe the revolving propellers.

The Court does not conclude that liability should attach because defendant failed to warn plaintiff that revolving propellers are dangerous; such fact is open and obvious, *Trimyer, supra*, and was known to plaintiff. The E–2B, however, is a plane of unusual design. The importance of learning the proper mode of boarding and disembarking was highlighted by the repeated testimony herein that one should never pass through the propeller arc lest bad habits develop. Thus, those most familiar with the aircraft took caution to enforce in themselves the proper manner of approaching the plane. Yet plaintiff, who was totally unfamiliar with the craft, was not so instructed and was led through the propeller arc on all occasions in which he was escorted by those experienced with the aircraft.

The Court also concludes that failure to warn plaintiff that the propellers were revolving during the stop at Oceana constituted negligence. The hazard posted by revolving propellers is an obvious one, and was known to plaintiff. Yet, the invisibility of the propellers herein, the inability to discern their location from the noise created, and the proximity of the propellers to the hatch door posed such a great danger that the N.A.T.O.P.S. E–2B Manual required that even those most familiar with the craft, the crew members, not disembark until the propellers were stopped. Under these circumstances, defendant owed plaintiff a duty to warn him that the propellers were left revolving.

Defendant argues that plaintiff was contributorily negligent, contending that

> . . . a passenger who negligently walks into the revolving propeller after alighting from an airplane cannot recover for the resultant injury if he knew or could and should have known by the exercise of ordinary care and prudence that the propeller was revolving, either by seeing it or from feeling the movement of

air, if any caused thereby, or by any other means. 8 Am.Jur.2d Aviation § 86, pp. 712–13.

The Court disagrees. The propellers were not easily visible because of the speed at which they revolved, and the noise they created did not aid plaintiff in determining their location. Plaintiff was nervous and excited. He was in an unusual aircraft and left alone under circumstances which confused him. In light of these facts, the Court is unwilling to conclude that plaintiff was guilty of contributory negligence. See *Stewart v. Loughman*, 367 Pa. 486, 80 A.2d 715 (1951); *Cape Charles Flying Service, Inc. v. Nottingham*, 187 Va. 444, 47 S.E.2d 540 (1948); *Curtiss-Wright Flying Service v. Williamson*, 51 S.W.2d 1047 (Tex.Ct.App. 1932) rejecting similar arguments.

Accordingly, judgment will be entered in plaintiff's favor for the amount of damages sustained.